COURT OF APPEALS
DECISION
DATED AND FILED

January 2, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.    2023AP1865-CR**

**STATE OF WISCONSIN**

Cir. Ct. No.  2022CF173

**IN COURT OF APPEALS
DISTRICT III**

STATE OF WISCONSIN,

   PLAINTIFF-APPELLANT,

 V.

JEFFREY ANTHONY CHARLES,

   DEFENDANT-RESPONDENT.

        APPEAL from an order of the circuit court for Douglas County: KELLY J. THIMM, Judge.  *Reversed and cause remanded with directions.*

        Before Stark, P.J., Hruz and Gill, JJ.

        **Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

        ¶1      PER CURIAM.   The State of Wisconsin appeals an order granting in part and denying in part its motion to admit other-acts evidence.  The State argues

that the circuit court erroneously exercised its discretion by excluding portions of the State's proposed other-acts evidence because the court improperly applied the standard established in *State v. Sullivan*, 216 Wis. 2d 768, 576 N.W.2d 30 (1998), particularly in light of the greater latitude rule in WIS. STAT. § 904.04(2)(b)1. (2021-22).[1]

¶2    We conclude that the circuit court erroneously exercised its discretion because it failed to adequately explain how the greater latitude rule factored into its decision excluding portions of the State's proposed other-acts evidence. Accordingly, we reverse and remand with directions that the court better explain how it applied the greater latitude rule to its decision excluding those portions of the other-acts evidence.

## BACKGROUND

¶3    The following facts are taken from the criminal complaint and the State's other-acts motion. The State charged Charles with repeated sexual assault of a child, as a persistent repeater, based on Willa's[2] allegations that Charles sexually assaulted her numerous times between 2005 and 2010, when she was between three and eight years old. At the time of the assaults, Willa and her family were members of the "Neighbors to Nations" church in Minnesota, and Charles was the church's pastor. Church members often traveled to Charles's property in Summit, Wisconsin, which contained multiple cabins. Willa alleged that the sexual

---

[1] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] Pursuant to the policy underlying WIS. STAT. RULE 809.86, we use pseudonyms when referring to the victim in this case and the other-acts victims.

assaults occurred in one of Charles's Wisconsin cabins, in Minnesota, and during mission trips to Mexico and Europe.

¶4    Willa alleged that Charles sexually assaulted her three to four times at his property in Summit, Wisconsin. She stated that Charles would seat her on a bed, put his hand down her pants, and "insert his finger into her vagina in a rubbing motion." At the same time, Charles would put his other hand down his pants and stroke his penis. Charles would then tell Willa "to be quiet and not tell anyone that he was doing this." Willa also stated that when she was five years old, Charles started "to get more aggressive with her when the sexual assaults occurred and told her he would hurt her if she told anyone." Willa further stated that she was alone with Charles in a cabin on his property when the Wisconsin sexual assaults occurred, but other church members were present on the property.

¶5    Willa described the church as a "family environment with [Charles] as the father figure." She stated that Charles made her feel like she was his daughter and that she considered him to be more of a father to her than she did her own biological father. She also stated that Charles was "loving but intimidating," and she described him as "someone who had a sort of power that led her to obey him." Willa also explained that it was normal for adult church members, including Charles, "to discipline children, because all children were born into the church."

¶6    Willa alleged that she belonged to a group of girls that Charles treated as special. She stated that Charles would have her and this special group of girls call him "daddy Charles." Willa explained that she was younger than the other girls in the group and that she "had a different, closer, relationship with Charles." Willa further stated that "Charles would have her serve him by rubbing his feet and getting food and other things for him while he was in his room." If she made a mistake or

misbehaved, Charles would "scream at her and spank her." Charles also used Willa to pressure parishioners who were attempting to leave the church to stay "by asking why they were leaving [Willa]."

¶7     The State moved to admit other-acts evidence of Charles's sexual assaults of Willa that occurred outside of Wisconsin and of allegations by five other victims of unwanted sexual contact by Charles. The testimony from two of the proposed other-acts victims, Alice and Darlene, is relevant to this appeal. The State premised its motion on the idea that evidence of the power dynamic and culture prevalent in the church "family" was relevant to understanding Willa's sexual assault allegations.

¶8     The circuit court held two hearings on the other-acts motion. At the first hearing, the court admitted the evidence of Charles's sexual assaults of Willa outside of Wisconsin, but it requested supplemental briefing on the similarities between the allegations made by the five other victims and the alleged offense, explaining that it would have difficulty assessing the similarities without more specificity. The State then filed its supplemental other-acts brief.

¶9     At the second hearing on the other-acts motion, the circuit court considered the proposed other-acts evidence, admitted portions of Alice's and Darlene's testimony, but excluded other portions of their testimony.[3] The court subsequently entered a written order on the other-acts motion. The State now appeals the part of that order excluding portions of Alice's and Darlene's testimony.

---

[3] In both its supplemental brief and at the start of the second hearing, the State withdrew its request to admit other-acts evidence from two of the five victims. As to the third victim, "Victim B," the circuit court excluded all of that victim's testimony. The State does not appeal the exclusion of Victim B's testimony.

4

A more detailed discussion of their testimony, and the court's reasoning for its rulings, will be provided below.

## DISCUSSION

¶10   We review a circuit court's decision to admit or exclude other-acts evidence for an erroneous exercise of discretion. *State v. Marinez*, 2011 WI 12, ¶17, 331 Wis. 2d 568, 797 N.W.2d 399. We will uphold the court's decision if it "examined the relevant facts, applied a proper standard of law, used a demonstrated rational process and reached a conclusion that a reasonable judge could reach." *Id.* (citation omitted).

¶11   The admission of other-acts evidence is governed by WIS. STAT. § 904.04(2), which prohibits the admission of "evidence of other crimes, wrongs, or acts … to prove the character of a person in order to show that the person acted in conformity therewith." Sec. 904.04(2)(a). Such evidence is not prohibited when it is "offered for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* In order to determine whether other-acts evidence is admissible, we use the test set forth in *Sullivan*. Under that test, other-acts evidence is admissible if: (1) the evidence is offered for a permissible purpose under § 904.04(2)(a); (2) the evidence is relevant; and (3) the evidence's "probative value is not substantially outweighed by the risk of unfair prejudice." *State v. Dorsey*, 2018 WI 10, ¶39, 379 Wis. 2d 386, 906 N.W.2d 158.

¶12   Permissible purposes are listed in WIS. STAT. § 904.04(2)(a), and they may also include "context, credibility, and providing a more complete background." *Marinez*, 331 Wis. 2d 568, ¶27. Whether other-acts evidence is relevant is a two-fold inquiry. *Dorsey*, 379 Wis. 2d 386, ¶44. First, "[t]he evidence must relate

5

to a fact or proposition of consequence." *Id.* (alteration in original; citation omitted). Second, "the evidence must have probative value." *Id.* This second step asks "whether the other acts are similar, that is, whether they are near 'in time, place, and circumstance[,] to the alleged crime or to the fact or proposition sought to be proved.'" *Id.*, ¶49 (alteration in original; citation omitted).

¶13 In addition, the greater latitude rule provides that when a defendant is charged with a violation of WIS. STAT. ch. 948, as Charles is here, "evidence of any similar acts by the accused is admissible, and is admissible without regard to whether the victim of the crime that is the subject of the proceeding is the same as the victim of the similar act." WIS. STAT. § 904.04(2)(b)1. "The greater latitude rule liberalizes each of *Sullivan*'s three prongs in favor of admitting similar acts of child sexual assault." *State v. Gutierrez*, 2020 WI 52, ¶29, 391 Wis. 2d 799, 943 N.W.2d 870. This more liberal standard applies because of the difficulty prosecutors have in obtaining admissible evidence in child sexual assault cases and because of "the need to corroborate the victim's testimony against credibility challenges." *Marinez*, 331 Wis. 2d 568, ¶20 n.15 (citation omitted). The rule does not, however, "relieve a court of the duty to ensure that the other[-]acts evidence is offered for a proper purpose, is relevant, and its probative value is not substantially outweighed by undue prejudice." *Gutierrez*, 391 Wis. 2d 799, ¶29.

¶14 In its motion, the State identified the following purposes to admit the other-acts evidence: (1) establishing Charles's "plan to manipulate, groom, control, and isolate female parishioners for sexual purposes using his religious authority"; (2) demonstrating Charles's "method of operation for accessing and assaulting female parishioners"; (3) showing context and supporting Willa's credibility; and (4) establishing Charles's "intent to be sexually aroused or gratified and his motive."

6

¶15 Before considering and analyzing the other-acts evidence at the second hearing, the circuit court acknowledged that it was determining whether the other-acts evidence "meets the *Sullivan* analysis in light of the greater latitude [rule]." In doing so, the court noted only that the "similarities don't have to be quite the same" under the greater latitude rule and that "[t]hey can be more tangential similarities to admit other acts. And I think that's where I'm looking at it … I'm looking at this under the lens of the greater latitude rule … which I'm required to do." The court then considered and ruled on the following testimony from Alice and Darlene.

## I. Alice's testimony

¶16 According to the State, Alice would testify that she joined the church when she was young, that her father left her family when she was young, and that Charles was like a father figure to her. Alice belonged to Charles's special group of girls, and she believed that Charles was "God's chosen one." Alice would also testify that: it was "normal and expected for her to spend time at [Charles]'s residences"; Charles would ask her to do things for him, such as "rub his feet and legs, get items for him, and clean his home"; and she would be subject to "accusations and guilt trips" from Charles if she failed to spend time at his residences. Alice would further testify about explicit sexual comments that Charles made to her when she was sixteen or seventeen years old. Charles also checked if she had gained weight either by asking her to lift her shirt or by touching her breasts over her clothing.

¶17 Alice would also testify that Charles attempted to, and did, sexually assault her on more than one occasion between 2005 and 2006 when she was sixteen or seventeen years old. She would further testify that in 2006, when she was

seventeen years old, Charles asked her to massage his upper thighs while in his home office and then asked her to touch "his private area." Alice did as instructed, but Charles stopped her before she touched his private area. This conduct occurred more than once, and other people were present in Charles's home when it occurred. Finally, Alice would testify that between 2005 and 2006, there were instances when Charles asked her "to close her eyes and open her heart and then have her touch his penis" and that after she touched his penis, he would stop Alice "and say he could trust her."

¶18 The circuit court admitted all of the above testimony from Alice except for two portions. First, the court excluded Alice's testimony that Charles attempted to, and did, sexually assault her on more than one occasion when she was sixteen or seventeen years old because, according to the court, the testimony was not relevant. The court concluded that there was a permissible purpose to show context, which included, as the State emphasized, the repeated and similar nature of Charles's sexual assaults of young female parishioners. Acknowledging that "the similarities don't have to be close," the court then explained that it could not determine whether this portion of Alice's testimony was similar to Willa's specific allegations because the State did not identify the type, location, dates, or specific number of assaults. The court stated that it was excluding the evidence "because I don't have the tools in order to analyze it to even find that it's similar or dissimilar."

¶19 Second, the circuit court excluded Alice's testimony that between 2005 and 2006, when she was sixteen or seventeen years old, there were instances when Charles appealed to her emotions and asked her to touch his penis. The court explained that this portion of Alice's testimony was not relevant because it lacked similarities with Willa's allegations and because the State had not identified the specific number of times the act occurred, where it occurred, and the context of the

8

testimony. According to the court, this portion of Alice's testimony was "too vague, not close enough [for] me [to be] able to see any similarities. To me, there's a lot of dissimilarities, and when I look at it, even under the greater latitude rule, [Alice's testimony] doesn't come in." Although the court noted that there was a similarity in that both Alice and Willa were children, it determined that this portion of Alice's testimony was too general to have any probative value.

¶20 In excluding the two portions of Alice's testimony, the circuit court appropriately focused on the lack of specificity in the testimony that would not allow it to perform a relevancy analysis, in the form of finding sufficient similarities between Alice's testimony and Willa's allegations. The court, however, failed to explain how the greater latitude rule factored into this relevancy analysis, even given the identified lack of specificity.

¶21 Although the circuit court noted it was examining the evidence under the lens of the greater latitude rule and even noted the rule in excluding one portion of Alice's testimony, the court failed to adequately explain how the greater latitude rule factored into its analysis when it examined the excluded portions of Alice's testimony. Specifically, the court failed to explain why, when viewing the testimony under a greater latitude lens and considering the purposes for which it was offered, the lack of specificity in the testimony nevertheless caused the court to determine the testimony was irrelevant, or that it lacked probative value. Yet, the court was able to explain its application of the greater latitude rule to the admitted portions of Alice's testimony, which were offered for the same purposes and based on the same similarities as the excluded portions of Alice's testimony.

¶22 The circuit court could have concluded that the greater latitude rule facilitated the admission of the two excluded portions of Alice's testimony for the

purpose of showing context and based on the similarities that the court found for one of the admitted portions of Alice's testimony. Like Willa's allegations, the two acts in the excluded portions of Alice's testimony involve a form of sexual assault of a child. Moreover, and importantly, both girls were assaulted while living within the context of a specific institutional culture, which allegedly enabled their submission to Charles's sexual advances. We acknowledge the court's other valid concerns with the lack of details and potentially insufficient similarities between Willa's and Alice's respective alleged sexual assaults. However, it is unclear to us why the court deemed these omissions alone as a basis to exclude portions of Alice's testimony under the greater latitude rule.

¶23 We conclude that the circuit court erroneously exercised its discretion by failing to sufficiently explain how the greater latitude rule factored into its reasoning for excluding the two portions of Alice's testimony. Because the court failed in this regard, we are unable, at this time, to conclude whether the court erred by excluding those portions of Alice's testimony. *Cf. **State v. Coria-Granados***, No. 2019AP1989-CR, unpublished slip op. ¶44 (WI App Feb. 11, 2021) (noting that it "was not entirely clear which step of the ***Sullivan*** analysis the circuit court was analyzing" during its discussion of the other-acts evidence and that the circuit court "did not explicitly recognize that the question of whether a jury could reasonably find that the other acts occurred is part of step two of the ***Sullivan*** analysis," but determining that there was "a sufficient basis in the record to conclude that the circuit court took up this specific question").[4] Therefore, we remand to the circuit

---

[4] An unpublished opinion that is authored by a member of a three-judge panel and issued on or after July 1, 2009, may be cited for its persuasive value. *See* WIS. STAT. RULE 809.23(3)(b).

court to better explain how it applied the greater latitude rule to its decision to exclude portions of Alice's testimony.

## II. Darlene's testimony

¶24 The State's other-acts motion asserted Darlene would testify that she started attending the church youth group when she was twelve years old and that her father left her family before her family joined the church. Darlene belonged to Charles's special group of girls; she was expected to spend time at Charles's residences; she would do things for Charles such as "rub his feet and legs, get items for him, and clean his home"; and she would be subject to "accusations and guilt trips" from Charles if she failed to spend time at his residences. Darlene would also testify that when she participated in mission trips, young girls had to rub Charles's hands and feet "when he claimed to be under spiritual attack or sick," and Charles would be naked under a blanket while those girls rubbed his hands and feet.

¶25 Darlene would further testify that Charles sexually assaulted her regularly between 2005 and 2010, when she was sixteen to twenty-one years old. The first incident occurred in 2005, when she was sixteen years old, in Charles's home in Minnesota. Charles kissed Darlene, touched her breasts over and under her shirt, and told her that "love was about taking risks and that God forgave her for what she did." Darlene would also testify that she first performed oral sex on Charles in 2005, that the oral sex occurred regularly, and that Charles "told her this is what she had to do to show love and if she did not say she liked it, he would tell her she was not being honest." Darlene would also state that the assaults began slowly and increased to multiple times a week; that the assaults "increased from kissing and touching to oral sex"; and that they occurred in Minnesota, on mission trips, and at Charles's property in Wisconsin.

¶26     Finally, Darlene would testify that in 2007, after she turned eighteen, she and another young girl were rubbing Charles's feet in his cabin in Wisconsin. Charles sent the other girl away and told Darlene to lock the cabin door. Darlene turned around to find Charles standing naked in front of her, and he told her that "she was an adult now and … to take a risk with her heart." Charles told Darlene to undress, laid her down on the bed, and had sexual intercourse with her. When Charles got up, there was blood on his penis, on Darlene's vagina, and on the bed sheets. Charles then told Darlene to clean herself and the sheets, hid the sheets in the trunk of his car, and told Darlene "that he forgave her and 'God forgives you.'" After this particular assault (hereinafter referred to as "the 2007 incident"), Darlene stated that Charles continued to have her rub his penis under his clothes and perform oral sex on him.

¶27     The circuit court admitted all of the above testimony from Darlene except for five portions. First, the court excluded Darlene's testimony that Charles sexually assaulted her regularly between 2005 and 2010 when she was sixteen to twenty-one years old because the testimony was not relevant. The court concluded that there was a permissible purpose to show context, but it observed that this portion of Darlene's testimony did not explain how Darlene was assaulted.

¶28     Second, the circuit court excluded Darlene's testimony that the assaults began slowly and increased to multiple times a week, "increased from kissing and touching to oral sex," and occurred in Minnesota, on mission trips, and at Charles's property in Wisconsin because, although the testimony provided context, it was not relevant and was unfairly prejudicial. The court explained that this portion of Darlene's testimony was too general and that it could not compare the testimony to Willa's allegations to find similarities. Although the testimony provided a location for where the acts occurred, the court noted that it "just gives

12

me [the assaults] increased from kissing and touching to oral sex. What does that mean? Who touching who[m]? What's going on?" The court added that this portion of Darlene's testimony lacked probative value and would be unfairly prejudicial to Charles.

¶29 Third, although the circuit court admitted Darlene's testimony that she first performed oral sex on Charles in 2005, it excluded the testimony that the oral sex happened regularly because that testimony lacked specificity. The court determined that this portion of Darlene's testimony was too generalized to find any similarities with Willa's allegations.

¶30 Fourth, the circuit court excluded Darlene's testimony regarding the 2007 incident because the testimony was not relevant. The court explained that there was an age difference between Darlene and Willa, that it was a child sexual assault versus an adult sexual assault, and that the 2007 incident was "not a similar type situation" to Willa's allegations. The court further concluded that the probative value of the 2007 incident was substantially outweighed by the risk of unfair prejudice to Charles, explaining that the testimony would "cause the jury to become emotional" and "make decisions unfavorable to [Charles] just based upon that type of serious allegation." It added that "this type of immoral behavior that, to me, is more of a—looking at him as a bad person…. [The jury is] going to forget about what the purpose is, and, in my opinion, there just isn't a purpose, other than to inflame the jury."

¶31 Finally, the circuit court excluded Darlene's testimony that after the 2007 incident, Charles continued to have her rub his penis under his clothes and perform oral sex on him because the testimony had no permissible purpose, no probative value, and was highly prejudicial. The court explained that for this portion

13

of Darlene's testimony, the key distinction was that one was a child and one was an adult. The court acknowledged that it was possible to have other-acts evidence of an adult sexual assault admitted in a child sexual assault case and when analyzing such evidence, it would consider the age and "the similarities to the incidents themselves, and see if they're so similar that you would find them admissible. And in this case, I just don't find them similar enough to make them admissible."

¶32 Like with Alice, in excluding the first three portions of Darlene's testimony, the circuit court reasonably focused on the lack of specificity in the proposed testimony, which the court claimed would not allow it to find sufficient similarities between Darlene's testimony and Willa's allegations. For the 2007 incident and the acts after that incident, the court focused on the lack of similarities between the acts in those excluded portions of Darlene's testimony and Willa's allegations and also on the fact that Darlene was an adult. In excluding all of these portions of Darlene's testimony, however, the court never mentioned the greater latitude rule, either explicitly or implicitly. It did so only when *admitting* portions of Darlene's testimony.

¶33 It is unclear to us why the circuit court did not determine that the greater latitude rule made the first three portions of Darlene's excluded testimony appropriate for admissibility based on at least two of the same similarities it found for one of the admitted portions of Darlene's testimony. Both Darlene and Willa were children, and, although the forms of sexual assault Darlene experienced were different from the ones that Willa experienced, they were still actions constituting child sexual assault.

¶34 Yet, the circuit court did not explain why, in light of the greater latitude rule, those similarities were insufficient to admit the three excluded portions

14

of Darlene's testimony. This omission is particularly notable when considering the purposes for which this evidence was offered—i.e., to show context, to support Willa's credibility, and to establish Charles's plan of manipulating and isolating young female parishioners for sexual purposes. The court failed to explain why, under the greater latitude rule, it did not find relevant this evidence introduced to show that in the context of Charles's father-like role in the church, he singled out and repeatedly sexually assaulted young girls and women who had no father of their own.

¶35 Moreover, the circuit court failed to explain how the greater latitude rule applied to each prong of its *Sullivan* analysis of Darlene's excluded testimony, especially with respect to the last two portions of Darlene's excluded testimony— i.e., the 2007 incident and the acts that occurred after that incident. The court did not explicitly reference the rule in its decision regarding these two portions of Darlene's testimony, or any of the other excluded portions, nor can we discern any implicit reference to or application of the rule. Instead, the court seemed to apply a *Sullivan* analysis without any consideration of the greater latitude rule. Thus, we cannot determine whether the court applied the rule to the excluded portions of Darlene's testimony, and, if it did so, we cannot determine how the court's application of the rule factored into its decision to exclude those portions of Darlene's testimony.

¶36 In sum, and for the foregoing reasons, the circuit court failed to adequately explain how the greater latitude rule factored into its decision excluding portions of Alice's and Darlene's testimony. Additionally, as to Darlene's testimony, the court failed to state whether and how it applied the greater latitude rule to each prong of its *Sullivan* analysis. We stress that we are not concluding that any or all of the excluded evidence the State addresses in this appeal should be

admitted; the circuit court may reconsider its decision, or it may ultimately reach the same conclusion. Rather, we remand the case for the court to explain more clearly how the greater latitude rule factored into its decision to exclude portions of Alice's and Darlene's respective testimony.

*By the Court.*—Order reversed and cause remanded with directions.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.